**FEDERAL INSURANCE COMPANY,**
Plaintiff/Respondent,

v.

**GULF INSURANCE COMPANY,**
Defendant/Appellant.

No. ED 84501.

Missouri Court of Appeals,
Eastern District,
Division Two.

March 8, 2005.

Application for Transfer to Supreme
Court Denied April 19, 2005.

Application for Transfer Denied
May 31, 2005.

Robyn Greifzu Fox, Catherine Vale Jochens, Moser and Marsalek, P.C., St. Louis, MO, Michael Resis, Julie P. Rubin, O'Hagan, Smith & Amundsen, L.L.C., Chicago, IL, for appellant.

Edward Thomas Liese, Matthew Eddy, Alison Durphy, Holtkamp, Liese, Childress & Schultz, P.C., St. Louis, MO, for respondent.

KATHIANNE KNAUP CRANE, Judge.

Defendant, Gulf Insurance Company (Gulf), appeals from the trial court's entry of summary judgment in favor of plaintiff, Federal Insurance Company (Federal), on Federal's claim for equitable contribution to the $2,900,000 that Federal paid on behalf of its insured under the excess coverage of its commercial umbrella policy to settle a personal injury action arising out of the death of Federal's insured's employee while working on a job for Gulf's insured pursuant to a contract between the insureds. We reverse and remand. Federal's insured had agreed to indemnify Gulf's insured for all losses and liabilities arising out of the work under the contract unless Gulf's insured was solely at fault, and Federal's insured purchased insurance from Federal to cover its contractual obligations. Because Federal's insured was required to indemnify Gulf's insured, Federal was not entitled to equitable contribution from Gulf.

## FACTUAL AND PROCEDURAL BACKGROUND

Federal's motion for summary judgment was based on following stipulated facts. On January 20, 1998, S.C. Sachs Company, Inc., (Sachs), as contractor, and Aqualon Company (Aqualon), a division of Hercules, Inc. (Hercules), entered into a contract (the contract) for Sachs to perform electrical work at the Aqualon facility. The contract between Sachs and Aqualon contained an indemnification provision, by which Sachs agreed to hold Aqualon and Hercules harmless for all liability for personal injury or death sustained by Sachs' employees, as follows:

3.2 *INDEMNITY.*

(a) Contractor agrees to defend, indemnify and save Aqualon .. [and Hercules] harmless from and against all liability, loss or expense ... because of personal injury (including death at any time resulting therefrom) or loss of or damage to property ... sustained by any person or persons ... arising out of, resulting from, or in consequence of the performance of the work under this Contract ... but excluding Claims caused by the sole act or omission (whether negligent or otherwise) of Indemnit[e]es.

The contract required Sachs to procure and maintain a comprehensive general liability policy with a minimum bodily injury limit of $500,000 per occurrence and an umbrella liability policy with a minimum coverage of $2,000,000 per occurrence. The contract required both policies to include Aqualon and Hercules as additional insureds on any claims arising out of or resulting from work performed under the contract. Sachs obtained a comprehensive general liability policy through Fireman's Fund, with a per occurrence general liability limit of $1,000,000. In addition, Sachs obtained a commercial umbrella liability policy through Federal, with excess follow form liability insurance that provided $50,000,000 in coverage above the Fireman's Fund policy. The Federal policy contains an "other insurance" provision, which provided:

Other Insurance

If **other insurance** applies to claims covered by this policy, the insurance under this policy is excess and we will not make any payments until the **other insurance** has been exhausted by payment of claims. This insurance is

not subject to the terms or conditions of any **other insurance.**

Aqualon obtained a commercial excess occurrence policy from Gulf, which had a $12,000,000 limit above a $2,000,000 self-insured retention. The Gulf policy's "other insurance" clause provided:

J. Other insurance

If other insurance applies to claims covered by this policy, the insurance under this policy is excess of such other insurance and we will NOT make any payments until the other insurance has been used up. This condition shall not apply, however, if the other insurance is specifically written to be excess over this policy.

Hercules and Aqualon qualified as "insureds" under the Fireman's, Federal, and Gulf policies.

Pursuant to Hercules Purchase Order No. 4500169304, Sachs was to replace an electric pole at the Aqualon Facility. That purchase order also contained an indemnification provision, which provides in part:

[Sachs] shall indemnify, defend, and save [Aqualon] harmless from and against all liability, losses and expenses (including costs and attorney's fees) for any suit, claim, settlement, award or judgment ... arising out of the failure of [Sachs] to comply with safety and security regulations, and out of any negligence on the part of [Aqualon], except to the extent such claim may be caused solely by the negligent act or omission of [Aqualon].

On August 16, 1999, Sachs employee Michael Ryals was electrocuted while working at the Aqualon Facility pursuant to the contract and purchase order between Sachs and Aqualon, and died as a result of this accident. Also as a result of the accident, the Occupational Safety and Health Administration (OSHA) issued a Citation and Notice of Penalty to Sachs in connection with its work under the contract and purchase order.

On October 10, 2001, the Circuit Court of St. Louis County approved a settlement of $3,500,000 to Mr. Ryals' wife and children in full release of Hercules, Aqualon, and Sachs. Federal paid $2,900,000 and Fireman's Fund paid $600,000[1] towards the court-approved settlement of the claim. There was no judicial determination that the accident was caused solely by the negligence of Aqualon or Hercules. The parties agree that the settlement was reasonable. While the settlement was being negotiated, Federal requested that Aqualon and Hercules contribute to the settlement, but both refused. During the settlement negotiations, Federal advised Gulf it would seek contribution from Gulf at a later date. Neither Aqualon nor Hercules contributed to the settlement.

Federal subsequently filed an Amended Petition for Contribution and Declaratory Judgment against Gulf to obtain contribution in the amount of $561,290, prejudgment interest, and a declaratory judgment on Gulf's obligation to contribute to the settlements. Gulf filed a motion for summary judgment based on its claim that the insurance payments to the settlement were made to satisfy Sachs' contractual obligation to hold harmless Aqualon and Hercules from any liability for personal injury or death of Sachs employees. Federal filed a cross-motion for summary judgment based on its claim that Gulf was responsible for 12/62 of the $2,900,000 settlement, or $561,290. The trial court

---

1. It had also paid $400,000 to another employee injured in the accident, thus meeting its $1,000,000 per occurrence coverage.

granted Federal's motion and awarded Federal $561,290 and prejudgment interest. Gulf appeals.

## DISCUSSION

We review the grant of summary judgment *de novo*. *ITT Commercial Finance v. Mid–Am. Marine*, 854 S.W.2d 371, 376 (Mo. banc 1993). When the underlying facts are not in question, disputes arising from the interpretation and application of insurance contracts are matters of law for the court. *Southeast Bakery Feeds v. Ranger Ins. Co.*, 974 S.W.2d 635, 638 (Mo.App.1998). In addition, summary judgment may properly resolve claims interpreting a contractual indemnification provision. *Nusbaum v. City of Kansas City*, 100 S.W.3d 101, 105 (Mo. banc 2003).

For its first point, Gulf contends that the trial court erred in finding that Federal was entitled to equitable contribution, because the rights and liabilities of Gulf and Federal were governed by the indemnity obligations of their respective insureds, in that Federal's insured, Sachs, had specifically agreed to assume the tort liability of Gulf's insured, Aqualon, in an "insured contract," and the liability was covered solely by the Federal policy. We agree.

### A. General Rule—Equitable Contribution

The trial court's award of equitable contribution to Federal was based on its application of a general rule governing "other insurance" clauses. Under this rule, if neither concurrent policy has an "other insurance" provision, both insurers are required to prorate in proportion to the amount of insurance provided by their respective policies. *Arditi v. Massachusetts Bonding & Insurance Co.*, 315

S.W.2d 736, 743 (Mo.1958). When both policies contain similar "other insurance" clauses, the clauses are treated as mutually repugnant and are disregarded. *Id.*[2] In this situation, the losses are prorated as though neither policy had an "other insurance" clause. *Id. Arditi* applies to concurrent primary policies, but this rule also applies to concurrent excess policies. *Crown Center v. Occidental Fire & Cas. Co.*, 716 S.W.2d 348, 355 (Mo.App.1986); *see also Planet Ins. Co. v. Ertz*, 920 S.W.2d 591, 595 (Mo.App.1996). This rule requires the insurers to prorate the loss in proportion to the amount of coverage by their respective policies and allows the insurer paying more than its share of the claim to recover the excess paid from the other insurer.

### B. Exception—Indemnity Agreements

However, an exception to this general rule has developed in situations in which "the policy of the insurer seeking to invoke the 'other insurance' clauses also covers another insured who is liable to indemnify the insured in the policy of the other insurer." *American Indem. Lloyds v. Travelers Property*, 335 F.3d 429, 436 (5th Cir.2003) (predicting Texas law). "In a variety of commercial relationships, such as lessor-lessee and contractor-subcontractor, the contracts between the parties contain indemnification agreements in which one agrees to hold the other harmless for its own acts of negligence or that of its employees. Such contractual arrangements can nullify a right to contribution." 15 Lee R. Russ & Thomas F. Segulla, Couch on Insurance 3D Section 218:19, p. 218–25 (1999). Thus, "an indemnity agreement between the insureds, or a contract

---

**2.** However, dissimilar "other insurance" clauses are not treated as mutually repugnant. *State Farm Mut. Auto. Ins. Co. v. Western Cas.*

*& Sur. Co.*, 477 S.W.2d 421, 426–27 (Mo. banc 1972); *Planet Ins.*, 920 S.W.2d at 595.

with an indemnification clause, such as is commonly found in the construction industry, may shift an entire loss to a particular insurer notwithstanding the existence of an other insurance clause in its policy." *Id.* at section 219.1, p. 219–7 citing *J. Walters Const., Inc. v. Gilman Paper Co.,* 620 So.2d 219 (Fla.App. 1 Dist.1993) (applying Georgia law).

"[M]ost, if not all, jurisdictions to have faced the question of whether an indemnification agreement could relieve particular insurers of an obligation to pay, without resort to a separate action to enforce the indemnification agreement, have answered in the affirmative." *St. Paul Fire & Marine Ins. v. Am. Intern. Spec. Lines,* 365 F.3d 263, 272 (4th Cir.2004) (predicting Virginia law). These cases give "controlling effect to the indemnity obligation of one insured to the other insured over 'other insurance' or similar clauses in the policies of the insurers, particularly where one of the policies covers the indemnity obligation." *American Indem.,* 335 F.3d at 436. *See also Wal–Mart Stores, Inc. v. RLI Ins. Co.,* 292 F.3d 583, 587 (8th Cir. 2002) (predicting Arkansas law); *Rossmoor Sanitation, Inc. v. Pylon, Inc.,* 13 Cal.3d 622, 119 Cal.Rptr. 449, 532 P.2d 97 (Cal.1975); *Hartford Cas. Ins. Co. v. Mt. Hawley Ins. Co.,* 123 Cal.App.4th 278, 20 Cal.Rptr.3d 128 (Cal.Ct.App.2004); *J. Walters,* 620 So.2d at 221; *Chubb Ins. Co. of Canada v. Mid–Continent Cas. Co.,* 982 F.Supp. 435, 438 (S.D.Miss.1997).

The rationale for this exception is to give effect to the insureds' indemnity agreement. "To hold otherwise would render the indemnity contract between the insureds completely ineffectual and would obviously not be a correct result, for it is the parties' rights and liabilities to each other which determine the insurance coverage; the insurance coverage does not define the parties' rights and liabilities one to the other." *Chubb,* 982 F.Supp. at 438. To apply the "other insurance" provisions to reduce the indemnitor's insurer's liability "would serve to abrogate the indemnity agreement between" the indemnitor and indemnitee owner. *J. Walters,* 620 So.2d at 221. "[T]o apportion the loss in this case pursuant to the other insurance clauses would effectively negate the indemnity agreement and impose liability on [owner's insurer] when [owner] bargained with [contractor] to avoid that very result as part of the consideration for the construction agreement." *Rossmoor,* 13 Cal.3d at 634, 119 Cal.Rptr. 449, 532 P.2d 97.

■ Further, failure to give effect to the indemnity agreement would result in circuitous litigation which would ultimately end with the excess carrier paying the settlement. *Wal–Mart,* 292 F.3d at 587; *American Indem.,* 335 F.3d at 437. Courts should consider obligations under an indemnity agreement before allocating responsibility for the settlement liability according to the terms of the relevant policies. *St. Paul,* 365 F.3d at 277.

The sole case on which Federal relies to refute this body of law is *Travelers v. American Equity,* 93 Cal.App.4th 1142, 113 Cal.Rptr.2d 613 (Cal.Ct.App.2001). In that case, which involved a different type of indemnity agreement, the California Court of Appeals held that the indemnitor's insurer was entitled to equitable contribution from the indemnitee's insurer. *Id.* at 1157–58, 113 Cal.Rptr.2d 613. *Travelers* is not persuasive authority. It has been extensively analyzed by *Hartford,* a subsequent California Court of Appeals case, which distinguished some of its holdings and rejected others. 123 Cal.App.4th at 301–05, 20 Cal.Rptr.3d 128. It also conflicts in various respects with the cases from other jurisdictions holding that indemnitor's insurer is solely liable to cover a loss or liability. We do not need to

address how *Travelers* differs from cases in other jurisdictions because, as distinguished and explained by *Hartford, Travelers* does not apply to the facts of this case.

Although no Missouri court has addressed this issue, we find the overwhelming authority that recognizes an exception to equitable contribution is persuasive and applicable to the resolution of the issues on this appeal.

### C. *Application of Exception*

▓▓▓ Whether an indemnity agreement is relevant and controls the obligations of the insurers depends upon the facts and circumstances of the particular case. *Wal–Mart*, 292 F.3d at 588; *see also St. Paul*, 365 F.3d at 271, 273–77; *Rossmoor*, 13 Cal.3d. at 633, 119 Cal.Rptr. 449, 532 P.2d 97. *Wal–Mart* identifies several considerations in this analysis that subsequent decisions have followed: 1) the validity of the indemnification agreement; 2) an insurance policy that covers the settlement; and 3) the intentions and relationships of the parties and the absence of unfair prejudice to the insurers. 292 F.3d at 587.

### 1. *Validity and Enforceability of Indemnification Agreement*

#### a. *Validity*

▓▓▓ The first consideration is whether the indemnification agreement between the indemnitor and the indemnitee was valid. *Wal–Mart*, 292 F.3d at 587; *St. Paul*, 365 F.3d at 271. "Missouri law makes clear that 'in a private contract, where the parties stand on a substantially equal footing, one may legally agree to indemnify the other against the results of the indemnitee's own negligence.'" *Nusbaum*, 100 S.W.3d at 105 (quoting *Kansas City Power & Light Co. v. Federal Const. Corp.*, 351 S.W.2d 741, 745 (Mo.1961)). That intention must be expressed in clear and unequivocal terms. *Nusbaum*, 100 S.W.3d at 105. Here the indemnity clause clearly and unequivocally requires Sachs to indemnify Aqualon, unless the loss or liability was caused by Aqualon's sole negligence.

#### b. *Enforceability*

Federal makes two arguments against enforceability, neither of which has merit.

##### (1) *No Prior Judicial Determination of Fault*

▓▓▓ Federal first argues that whether or not the indemnity language was valid, the enforceability of the indemnity clause could not be determined in the summary judgment action because a fact-finder in the underlying case never apportioned fault, citing *Travelers*, 93 Cal.App.4th at 1157–58, 113 Cal.Rptr.2d 613. The California appellate court in *Travelers* based its decision in part on the fact that no judicial determination of active or intentional negligence had been made, so no right to indemnity had been established. *Id.* No other jurisdiction to consider this issue has held that summary judgment is precluded in the absence of a judicial determination of fault. In *St. Paul*, 365 F.3d at 274, the U.S. Court of Appeals for the Fourth Circuit held that the trial court could determine on a motion for summary judgment that the settled liability in the underlying litigation did not arise from "fraud, gross negligence, or willful conduct." *See also American Indem.*, 335 F.3d at 441–42, distinguishing *Travelers* on this issue because it was based on principles of California law not followed in Texas.

·Further, *Travelers* has been distinguished in its own jurisdiction so that it does not apply when the issue is sole fault. In *Hartford*, the court pointed out that indemnity in *Travelers* was based on a

finding of no active or intentional negligence, an issue that had not been litigated by the parties. 123 Cal.App.4th at 301, 20 Cal.Rptr.3d 128. In contrast, in *Hartford,* the indemnitee was entitled to indemnity unless the indemnitee was solely at fault. *Id.* at 282, 20 Cal.Rptr.3d 128. *Hartford* held that the questions of sole fault and the insured's right to indemnity can be determined as matters of law on a motion for summary judgment between the insurers. *Id.* at 301–03, 20 Cal.Rptr.3d 128. Thus, even in California, the holding in *Travelers* that the indemnity agreement is not enforceable in the absence of a prior judicial determination of fault does not apply when the indemnity provision turns on sole fault and sole fault can be determined as a matter of law.

*Hartford* refutes Federal's argument that the indemnity agreement between Sachs and Aqualon is irrelevant to this case because there was no judicial determination of fault. The indemnity agreement in the contract provides that Sachs is required to hold Aqualon harmless for all loss "but excluding claims caused by the sole act or omission ... of indemnit[e]es." The indemnity agreement in the purchase order provides that Sachs is liable "except to the extent such claim may be caused solely by the negligent act or omission of [Aqualon]." In this case, Sachs was required to indemnify Aqualon unless Aqualon was solely at fault. Although sole negligence is ordinarily a question of fact, it " 'may be determined as a matter of law, however, when the evidence is so clear and undisputed that reasonable persons could not disagree.' " *Id.* at 301, 20 Cal.Rptr.3d 128 (quoting *Rossmoor,* 13 Cal.3d at 629, 119 Cal.Rptr. 449, 532 P.2d 97).

Whether the undisputed facts showed that Aqualon was or was not solely at fault is an issue that the trial court could decide on a motion for summary judgment in this case.

### (2) *Waiver*

██ Federal also argues that Aqualon waived its right to indemnification from Sachs by agreeing in the parties' Settlement Agreement and Full and General Release to release Sachs from any causes of action for indemnity, and therefore the indemnification agreement no longer controls the allocation of insured liability. This argument has no merit. Federal and Gulf explicitly agreed that the settlement agreement would not constitute a waiver of their rights and defenses against each other:

> It is the intention of Federal Insurance Companies and Gulf Insurance Group, with respect to any such claims, causes of action, or action against each other, to preserve all rights and/or defenses available under their respective insurance policies as of the time of the execution of this Agreement, and nothing contained herein should be construed as a waiver of any such rights and/or defenses as against each other.

Gulf preserved its defense to equitable contribution on the basis of the indemnity agreement by this language. *See St. Paul,* 365 F.3d at 274 n. 6.

### 2. *Insurance Policy Covering Settlement*

The next consideration is whether the excess carrier had provided the indemnitor with a policy that covered the settlement. *Wal–Mart,* 292 F.3d at 587. Federal does not dispute that its policy covered the settlement; rather, it claims that Gulf's policy also covers it.

### 3. *Intentions and Relationship of Parties and Prejudice to Insurers*

A third consideration is whether the indemnity agreement reflects the intentions

of and relationship between the parties and does not unfairly prejudice the insurers. *Wal–Mart,* 292 F.3d at 587; *St. Paul,* 365 F.3d at 271. Aqualon and Sachs contracted to assign to Sachs and its insurers the risks of bodily injury that was not solely the result of an act or omission by Aqualon, including death, arising out of the contracted work. Aqualon required Sachs to obtain a minimum of $2,500,000 in contractual liability coverage. Aqualon elected not to insure the first $2,000,000 in loss beneath the Gulf policy. Aqualon's substantial retained limit beneath the Gulf policy is consistent with the parties' intention that Sachs obtain an excess policy with a $2,000,000 liability limit in addition to a primary policy and the expectation that Sachs, and its insurers, would indemnify Aqualon for the bodily injury or death of a Sachs employee while on Aqualon's premises in the performance of the contracted work. The Fireman's and Federal policies satisfied the insurance requirements for contractual liability.

*Conclusion*

Sachs' obligation to indemnify Aqualon requires Sachs' insurers to cover the entire settlement amount. The trial court erred as a matter of law in allowing Sachs' insurer, Federal, to obtain equitable contribution from Aqualon's insurer, Gulf. Point one is granted.[3]

The summary judgment entered by the trial court is reversed and the case is remanded.

PATRICIA L. COHEN, P.J. and ROBERT G. DOWD, JR., J., concur.

---

**3.** Because we have found that point one requires reversal and remand, we do not reach Gulf's alternate claim for reversal contained in its second point.